Bonny E. Sweeney (SBN 176174)
Seth R. Gassman (SBN 311702)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: 415-633-1908
Fax: 415-358-4980
bsweeney@hausfeld.com
sgassman@hausfeld.com


[Additional Counsel Listed on Signature Page]


**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
KALEIDA HEALTH, on                                          :
behalf of itself and all others similarly                   :
situated                                                    :
                                                            :     **Civil Action No.**  3:21-cv-05266
              Plaintiff,                                     :
                                                            :
         v.                                                 :     **COMPLAINT AND JURY DEMAND**
                                                            :
INTUITIVE SURGICAL, INC.                                    :
                                                            :
              Defendant.                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Kaleida Health, on behalf of itself and all others similarly situated, upon

knowledge with respect to its own actions and upon information and belief with respect to all

other matters, alleges by way of Complaint against Defendant Intuitive Surgical, Inc.

("Intuitive"):

559718.1

Complaint and Jury Demand

# INTRODUCTION

1. This antitrust action, brought under Sections 1 and 2 of the Sherman Act, involves abuse of monopoly power claims, including a tying and monopoly leveraging scheme implemented by Intuitive in the sale of its da Vinci Surgical Robot System ("da Vinci"). Intuitive has obtained patents giving it monopoly power in the U.S. surgical robot market, but unlawfully leveraged that power to restrict competition in the separate (a) da Vinci surgical robot service aftermarket, and (b) da Vinci surgical robot instrument service aftermarket, by, among other things as alleged herein, tying the sale of the da Vinci to the service of the robot and the necessary robot instruments.

2. Intuitive conditions the sale or lease of the da Vinci on the purchaser's acceptance of Intuitive's mandatory service contract. The service contract requires the purchaser to use Intuitive as the sole service provider for all da Vinci systems, and prohibits the purchaser from either servicing the robot itself or hiring an independent robot repair company ("IRRC") to service the da Vinci.

3. Intuitive also ties the service, including repair and replacement, of da Vinci surgical instruments, sold under the brand name "EndoWrist," to the sale or lease of its robot system. Intuitive restricts the number of times a purchaser may use the EndoWrist instruments, in most cases to a mere ten uses. This forces Plaintiff and proposed Class members to purchase substantially more EndoWrists than necessary, rather than allowing the EndoWrists to be serviced and repaired for longer use, more in keeping with their useful lives. Intuitive's service of an EndoWrist instrument typically involves the sale and installation of a new replacement EndoWrist. According to the terms of the da Vinci sales agreements and service contracts,

hospitals cannot hire IRRCs to service or repair their EndoWrist instruments (i.e., clean or sharpen them for longer use).

4.     There are relevant primary markets for (a) surgical robots, (b) surgical robot instruments, and (c) the repair and/or replacement of surgical robots and surgical robot instruments. Additionally, there are relevant aftermarkets for service of (a) da Vinci robots; and (b) EndoWrist instruments (which includes their repair and replacement), which are separate from the primary markets. Intuitive has monopoly power in every relevant market and aftermarket. Intuitive's abuse of monopoly power scheme illegally exploits its market power in the surgical robot market to foreclose competition in the da Vinci Service and EndoWrist Service Aftermarkets. The scheme is successful and has almost completely inhibited competition in the service aftermarkets for either the da Vinci or EndoWrists, thus precluding customers from using the IRRCs, which deliver the same quality service at lower prices. Intuitive's conduct has thereby significantly increased costs to Plaintiff and the proposed Class. For example, IRRCs Restore Robotics LLC ("Restore"), Surgical Instrument Service Company, Inc. ("SIS"), Revanix Biomedical ("Revanix"), and Rebotix Repair LLC ("Rebotix") offer repair services for the da Vinci and EndoWrists by skilled and experienced technicians.

5.     Defendant's anticompetitive scheme has had the effect of driving the majority of Intuitive's annual revenues: in 2019, Intuitive reported product revenue of $2.621 billion in the U.S. out of a total $3.1 billion in U.S. revenue. Product revenues comprise revenues from the sales of da Vincis, accompanying accessories, EndoWrists and replacement EndoWrists. Most of Intuitive's U.S. revenue (57%) was attributable to instrument and accessory sales and replacement, and 16% was attributable to service contracts. While the coronavirus pandemic reduced the overall da Vinci-related revenues in 2020, Intuitive's revenues from its related

3

Complaint and Jury Demand

service and repair offerings still exceeded $2 billion in 2020 and represented approximately 77% of its total revenue in the U.S.

6.      But for Intuitive's unlawful abuse of monopoly power, IRRCs could service the da Vinci and EndoWrists, which would allow for competitive pricing in the da Vinci and EndoWrist Service Aftermarkets. For example, SIS states it charges its customers approximately 30-45% less to clean or repair an EndoWrist than Intuitive charges to replace the same EndoWrist. Restore also estimates that Intuitive charges approximately 30% higher prices on average for EndoWrist replacement as compared to EndoWrist repairs performed by IRRCs. Denying IRRCs the ability to service da Vincis forces Plaintiff and proposed Class members such as hospitals and clinics to pay supracompetitive prices for these services. Likewise, denying IRRCs the ability to service EndoWrists forces Plaintiff and proposed class members to spend thousands of dollars replacing instruments that could be repaired and safely reused throughout those instruments' useful lives.

7.      For these reasons and to remedy the injuries that have been caused by Intuitive's anticompetitive conduct, Plaintiff and the proposed Class seek treble damages.

## **PARTIES**

8.      Plaintiff Kaleida Health is a New York not-for-profit corporation with its principal place of business in Buffalo, New York. During the proposed Class Period (defined in paragraph 104, *infra*), Plaintiff Kaleida leased da Vinci Xi models directly from Defendant Intuitive, pursuant to written lease agreements, and it paid Defendant Intuitive for service to its da Vincis and EndoWrists. As a result of Intuitive's antitrust violations, Plaintiff and members of the proposed Class (defined in paragraph 104, *infra*) have been injured in their business or property.

9.    Defendant Intuitive Surgical, Inc. is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, CA. Intuitive is the creator and manufacturer of the da Vinci, along with its accessories and instruments, including the EndoWrist line of surgical instruments. Intuitive directly sells da Vincis and EndoWrists, along with associated parts and services, to hospitals, clinics and surgical centers throughout the United States, including in the Northern District of California.

## VENUE AND JURISDICTION

10.    This complaint is filed under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201 and 2202, and 15 U.S.C. §§ 15 and 26.

11.    Defendant transacts business and is found in this district. Substantial interstate trade and commerce involved and affected by the alleged violations of antitrust law occurs within this district. The acts complained of have had substantial anticompetitive effects in this district. Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

12.    Intradistrict Assignment. Although antitrust class actions are excluded from Local Rule 3-2(c), Intuitive is headquartered in Sunnyvale, California.

## GENERAL ALLEGATIONS

### A.  Relevant Markets

#### 1.    The Robotic Surgical Systems Market and Intuitive's Monopoly Power in That Market

##### a.  The Robotic Surgical Systems Product Market

13.    Robotic surgical systems are used for minimally invasive soft tissue surgeries performed between the pelvis and the head. Robotic surgery, like laparoscopic surgery done by hand, makes several incisions in soft tissue for the insertion of small surgical instruments to

perform a surgical procedure. The surgeon, sitting at a computer, uses hand-controls to manipulate the instruments that are attached to the system by robotic arms with joints.

14.     Robotic surgeries greatly mirror laparoscopic surgeries that have been performed by hand for decades. However, robotic surgeries have a variety of practical advantages over traditional laparoscopic surgeries, including:

    i.     Stereoscopic high-definition cameras for 3-D visibility;

    ii.    An additional robotic arm that allows the simultaneous use of three instruments;

    iii.   Wrist joints that allow for an expanded range of motion compared to human mobility;

    iv.    The ability to precisely perform small discrete movements with the robotic arms and instruments;

    v.     Minimizing surgeon fatigue; and

    vi.    Decreasing complication rates and reducing the lengths of patient stays.

15.     There is a relevant product market for robotic surgical systems. Surgical robots have no practical substitute, because although robotic surgery is significantly more expensive and less profitable than traditional laparoscopic surgical procedures, hospitals are expected to offer robotic surgeries.

16.     In fact, the very characteristics that make surgical robots unique and more expensive – enhanced visualization using high-definition cameras, precise and tremor-free instrument controls, advanced instrumentality, and improved surgeon ergonomics – make robotic surgeries preferable to traditional laparoscopic procedures for surgeons. Notwithstanding the fact that robotic surgery is itself more expensive than traditional laparoscopic surgery, hospitals

believe that robotic surgery can lower the overall cost to treat per episode by reducing

complications, shortening recovery times and hospital stays, and resulting in better long-term

health outcomes and higher patient satisfaction than with traditional laparoscopic surgery. Many

patients find that robotic surgery reduces pain, scarring, and is safer and more effective than

traditional laparoscopic surgeries. Thus, robotic surgery is generally preferable for hospitals and

their surgeons and patients.

17.     There is a very low cross-elasticity of demand between surgical robots and

laparoscopic surgery equipment, instruments, and service. A 2017 study estimated that hospitals

spent $1,701 on average per surgical robot procedure, which includes purchasing and

maintaining the system, an expense that is novel to robotic surgery.[1] It also found that the robotic

surgical system's instruments and accessories cost on average $1,866 per procedure.[2] By

comparison, the study estimated that instruments in traditional laparoscopic surgeries cost less

than $1,000 per procedure.[3] Further, most insurance plans pay the same amount for minimally

invasive robotic surgery and laparoscopic surgery, such that patients pay much more out of

pocket for minimally invasive robotic surgery and hospitals have lower (and sometimes

negative) margins on minimally invasive robotic surgery. Nevertheless, the estimated procedure

volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a

compounded annual growth rate of 23%.[4] Thus, it is apparent that an increase in the cost of a

minimally invasive surgical robot, instruments, and service does not lead doctors or patients to

choose laparoscopic or traditional surgery equipment instead, nor would a change in the cost of

---

[1] Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and
Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018).
[2] *Id.*
[3] *Id.*
[4] *Id*.

traditional or laparoscopic equipment affect the market for minimally invasive surgical robots, instruments, and service.

18.     Likewise, instead of using cheaper laparoscopic equipment for surgeries, hospitals are investing millions in replacing their laparoscopic equipment with robotic surgical systems, even at much higher prices. Accordingly, neither laparoscopic surgery nor any other procedure is substitutable with a robotic surgical system, as hospitals will not switch to those procedures even if the price of the robotic surgical system is raised above competitive levels.

19.     Robotic surgical systems and traditional laparoscopic surgical equipment occupy separate economic markets. The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots. Surgeons can specialize in robotic surgery, and there are several professional and trade associations focused on robotic surgery such as the Society for Robotic Surgery and the Clinical Robotic Surgery Association. Surgical robots have very distinct prices.

20.     Intuitive, founded in 1995, designs, manufactures, and markets the da Vinci directly to its customers in the U.S. The Food and Drug Administration ("FDA") approved the da Vinci for general laparoscopic surgery in 2000.[5] It was the only surgical robot system approved by the FDA for sale in the U.S. market until 2015. It is approved for both adult and pediatric use.

21.     The da Vinci, pictured below in Figure 1, consists of three main components: the surgeon's console where the surgeon sits to perform the operation; the patient-side cart which holds the camera and surgical instruments controlled by the surgeon; and the vision system which manages communication between all the system's component parts and has a view screen that allows the care team to view the surgery in real time.[6]

---

[5] Intuitive (Form 10-K), at 5 (Feb. 10, 2021).
[6] *Id.* at 6.

8
Complaint and Jury Demand

Figure 1: The Da Vinci Surgical System



22.     There are four generations of Intuitive da Vincis: the latest generation includes the Xi, X, and SP models. The third generation includes the Si model; the second is the S model; and the first-generation system is the 'standard' surgical system. The da Vinci SP is the latest system to be launched, in 2018.[7] The da Vinci X and Xi systems utilize different surgical instruments than earlier generation systems.

23.     Intuitive sells the da Vinci directly to hospitals and surgical centers, and also enters lease arrangements directly with certain qualified customers, a practice it started in 2013.[8]

---

[7] Id. at 63.

[8] Intuitive (Form 10-K), at 56 (Feb. 10, 2021). Intuitive also sells the da Vinci directly to leasing companies. When hospitals acquire da Vincis through leasing companies, hospitals enter an independent arrangement with the leasing company. Id.

It has also entered usage-based arrangements with larger customers. Under such arrangements, hospitals are charged for the system and service as the systems are utilized.

24.     As of December 31, 2020, Intuitive had an installed base of 3,720 da Vincis in the U.S.[9] The U.S. installed base has increased by over 45% in the past four years alone: as of December 31, 2016, Intuitive had an installed base of 2,563 da Vincis in the U.S.[10] Moreover, despite the coronavirus pandemic, the U.S. installed base grew by over 5% in 2020.[11]

25.     The da Vinci is a minimally invasive soft tissue surgical robot and may be used to perform a variety of surgical procedures including general, gynecologic, urologic, cardiothoracic, and head and neck surgeries. While other companies have introduced products in the field of robotic-assisted surgery, most of those machines cannot be used for minimally invasive soft tissue surgeries and none is a significant competitor in the surgical robot market. For example, a natural orifice surgical robot allows a surgeon to insert a flexible scope with a camera into the abdominal cavity via one of the body's natural orifices. The surgeon may then perform throat, neck, or colorectal surgical procedures. However, the robot can only operate instruments introduced through the tube inserted into the natural orifice. It is also not indicated for pediatric use. The constraints imposed by both the mode of access and the limited availability of tools for use with natural orifice surgical robots pose several challenges for surgeons and preclude it from competing in the surgical robot market. Likewise, orthopedic robots, which are designed for assisting in the removal of bone and aligning prosthetics for knee and hip replacement, are not indicated for use in minimally invasive soft tissue surgery and are not a practical substitute for surgical robots.

---

[9] *Id.* at 10 (Feb. 10, 2021).
[10] Intuitive (Form 10-K), at 9 (Feb. 6, 2017).
[11] Intuitive (Form 10-K), at 10 (Feb. 7, 2020) (3,531 systems in the U.S. as of December 31, 2019).

559718.1

Complaint and Jury Demand

26.    In 2020, approximately 876,000 procedures were performed using the da Vinci in the U.S.[12]

27.    The da Vinci ranges in price from $500,000 to $2.5 million. Intuitive reported $830.7 million in revenue from da Vinci sales in the U.S. in 2019, accounting for 61.7% of systems sales worldwide.[13]

28.    Intuitive sells all necessary robot service, and over 80 different types of surgical instruments for use with the da Vinci under the EndoWrist brand. As shown in Figure 2, below, EndoWrist instruments are modeled after the human wrist and offer a greater range of motion than the human hand. Figure 3, below, demonstrates the variety of EndoWrists available to hospitals.

Figure 2: EndoWrist modeled after human hand[14]



---

[12] Intuitive (Form 10-K), at 60 (Feb. 10, 2021).
[13] Intuitive (Form 10-K), at 87 (Feb. 7, 2020).
[14] Palep J. H. (2009). Robotic assisted minimally invasive surgery. Journal of minimal access surgery, 5(1), 1–7. https://doi.org/10.4103/0972-9941.51313; Intuitive; and Longmore, S. K., Naik, G., & Gargiulo, G. D. (2020). Laparoscopic Robotic Surgery: Current Perspective and Future Directions. Robotics, 9(2), 42.

Complaint and Jury Demand

Figure 3: Variety of EndoWrists available for use with the da Vinci



29.     Intuitive sells a variety of EndoWrist instruments with customizable tips for various surgical procedures including forceps, scissors, scalpels, and clamps. The da Vinci was designed to work exclusively with instruments manufactured and sold by Intuitive. Thus, EndoWrists are the only instruments compatible with the da Vinci and the only instruments approved by the FDA for use with the da Vinci.

30.     As derivative markets of the da Vinci system, the demand for da Vinci and EndoWrist service is directly linked to the installed base of da Vincis and how often those systems are used.

31.     Intuitive installs a programmable memory chip inside each instrument that limits the number of times the instrument may be used. A majority of EndoWrists have a maximum usage limit of 10.

### b. The Geographic Market for Surgical Robot Systems

32.     There is a national geographic market for surgical robot systems in the U.S. The FDA regulates the approval of all medical equipment in the U.S., including surgical robot systems. Manufacturers who wish to sell surgical robot systems in the U.S. must obtain FDA approval before doing so.

33.     The surgical robot systems approved for use in the U.S. are not substitutable; hospitals cannot import or operate non-approved surgical robot systems.

34.      U.S. hospitals are thus unable to buy surgical robot systems from suppliers in other countries, even if Intuitive raises its surgical robot system prices above competitive levels.

### c. Intuitive Has a Monopoly in the U.S. Market for Surgical Robots.

35.     Intuitive has monopoly power in the U.S. market for the sale of minimally invasive soft tissue surgical robots and, as a result, can and does exclude competition and maintain supracompetitive prices for the da Vinci.

36.     The number of procedures performed using the da Vinci has typically increased at least 14% year-over-year since 2017, with a 1% decrease in procedures performed in 2020 due to the ongoing Coronavirus pandemic.[15]

37.     In its most recent Annual Report, Intuitive states that it faces competition in the fields of "existing open surgery, conventional MIS [minimally invasive surgery], drug therapies, radiation treatment, and emerging interventional surgical approaches" and robotic-assisted surgery.[16] Intuitive does not cite any competition in the robotic surgical system market. A company called Asensus (formerly known as TransEnterix) received FDA approval for

---

[15] Intuitive (Form 10-K), at 60 (Feb. 10, 2021).
[16] *Id.* at 12.

commercial sale of its surgical robot in the U.S. in 2017,[17] shown below in Figure 4. Sold under the Senhance brand name, the robot is approved to perform gynecological, colorectal, and cholecystectomy surgeries, and inguinal hernia repair. It cannot perform certain surgeries, such as cardiothoracic or urological surgeries, making it less functional than the da Vinci. Nor is it approved for pediatric use. Asensus reported just $90,000 in revenues from system sales in 2019 in the U.S. and has had "limited commercial success to date" in the U.S.[18]

Figure 4: Senhance Surgical Robot[19]



38.     Asensus' *de minimis* market share in the surgical robot market is due to Intuitive's long established presence in U.S. hospitals, the amount of experience U.S. surgeons have with the da Vinci, and the number of da Vincis installed in the U.S. versus Senhance robots. Thus,

[17] Asensus (f.k.a. TransEnterix) (Form 10-K), at 4 (March 16, 2020).
[18] *Id.* at 13.
[19] *TransEnterix, Inc. Unveils New Brand Identity for Robotic Surgical System: Establishes Senhance™ to Communicate New Era in Robotic Surgery*, BusinessWire (Sept. 7, 2016), https://www.businesswire.com/news/home/20160907005187/en/TransEnterix-Inc.-Unveils-New-Brand-Identity-for-Robotic-Surgical-System.

559718.1

neither Senhance, nor any other company, is a significant competitor in the surgical robot market.

39.     While other companies have introduced products in the field of robotic-assisted surgery, these machines are not part of the surgical robot market and thus are not competitors of Intuitive's da Vinci. For example, a company called Medrobotics received clearance for a natural orifice surgical robot on July 23, 2015. However, the robot, sold under the Flex system brand name, can only operate instruments introduced through the tube inserted into the natural body orifice. Thus, due to its design limitations, it is only indicated for a limited range of procedures and is not a direct competitor to the da Vinci. And Asensus' Senhance system is not intended for most other procedures that the da Vinci may perform.

40.     Prior to FDA approval of the Senhance system for minimally invasive robotic surgeries, Intuitive maintained a 100% market share for surgical robots. Even after Senhance and Medrobotics entered the robotic surgery market, Intuitive still maintains at least a 98% market share in the market for surgical robots because neither company has been able to gain sufficient U.S. market share to pose a meaningful threat to Intuitive's market dominance. While Intuitive shipped 728 da Vincis throughout the U.S. in 2019, Asensus did not ship any Senhance systems domestically and Medrobotics shipped fewer than 10 Flex robot systems worldwide.

41.     External literature characterizes Intuitive as possessing monopoly power in the robotic surgical system market. For example, one 2017 study in the Journal of Minimal Access Surgery noted that Intuitive's da Vinci was "the only commercially available robotic equipment"

at the time.[20] Similarly, a 2019 study on robotic surgery noted that Intuitive "[e]ffectively [possessed] a monopoly" in the robotic surgery industry.[21]

42.    Switching surgical robot systems is not feasible. First, surgical robot systems require significant capital investment in not only the system itself, but also the necessary surgical instruments and, in many cases regarding the da Vinci, an agreement by Intuitive's customers not to purchase competing robots. Further, operating a robotic surgical system requires many hours of training. Switching surgical robot systems would not only be costly, as surgical robots have an average sales price of $1.5 million and many of Intuitive's U.S. customers have at least 2 systems representing significant capital investment, but would also require substantial time to retrain surgeons and supporting staff to operate the new system, during which time a hospital may not be able to offer robotic surgical services.

43.    In addition, Intuitive incentivizes hospitals to upgrade their existing da Vincis by offering them the opportunity to trade in their older da Vincis for a credit towards the purchase of a newer generation system.[22]

44.    There are significantly high barriers to entry into the surgical robot market. The cost to develop a surgical robot is substantial, especially because Intuitive maintains an extensive portfolio of patents that block the development of competing surgical robot systems. Furthermore, clearance by regulatory agencies, such as the FDA, is an extensive and uncertain process. Penetrating the market is also challenging; surgeons already have significant training and experience with the da Vinci, not to mention the already sizeable installed base of da Vincis

---

[20] Gkegkes, I. D., Mamais, I. A., & Iavazzo, C. (2017). Robotics in General Surgery: A Systematic Cost Assessment. Journal of Minimal Access Surgery, 13(4), 243–255. Https://Doi.Org/10.4103/0972-9941.195565
[21] Perez, R. E. & Schwaitzberg, S. D., Robotic Surgery: Finding Value in 2019 and Beyond, Ann. Laparosc. Endosc. Surg. 2019; 4:51.
[22] Intuitive (Form 10-K), at 89 (Feb. 10, 2021).

throughout the U.S. Furthermore, according to ¶ 23 of a complaint IRRC Restore filed against

Intuitive on March 29, 2021, Intuitive has agreements with its customers that they will not

purchase robotic surgery systems from competing manufacturers.

45.     Further, Intuitive enjoys a first mover advantage in the market because the da

Vinci was the first robotic surgery system approved by the FDA in 2000. Consequently, many

surgeons received extensive training to use the da Vinci during their residency, so hospitals

wishing to attract surgeons who can perform robotic surgeries (and consequently the patients

who wish to receive robotic surgery) are disincentivized from installing other robotic surgery

systems. This also limits the extent to which other robotic systems can compete effectively in the

market.

### 2.     The da Vinci Service Aftermarket and Intuitive's Monopoly Power in That Aftermarket

#### a.     The Da Vinci Service Aftermarket

46.     There is a relevant aftermarket in the U.S. for the service of da Vincis (the "da

Vinci Service Aftermarket"). The robotic surgery equipment manufacturing industry generates

about $3.8 billion in revenues per year in the U.S. and is expected to grow by 4.9% per year

between 2020 and 2025.[23] In addition, the medical equipment repair and maintenance services

industry is a $3.3 billion market in the U.S. and is expected to grow by 1.5% per year between

2020 and 2025.[24]

47.     After the da Vinci is installed, it requires regular maintenance and service. The

primary aspects of the da Vinci Service Aftermarket are the routine maintenance of the da Vinci

and the repair of the da Vinci when necessary.

---

[23] Thomas Crompton, "Robotic Surgery Equipment Manufacturing", IBIS World, Dec 2020, at 7.
[24] Jack Curran, "Medical Equipment Repair & Maintenance Services," IBIS World, June 2020, at 7.

48.     Recognizing this need for regular repair and maintenance, Intuitive enters into a service contract with their customers at the time the da Vinci is sold or leased.[25] The initial service contract is typically 5 years, with the first year of service being free and the remaining 4 years ranging in price from $80,000 to $190,000 per year.[26] At present, Intuitive requires its customers to purchase one of two types of service plans for its da Vincis, either:

     i.   the Complete Care Service Plan, which includes advance exchange program, remote software update, sterile reprocessing support, technical support, onsite access and monitoring and da Vinci surgery customer portal; or

    ii.   the Premium Care Service Plan, which includes everything in the Complete Care service plan and provides extended service hours, faster response time, expedited replacement parts and a 5% discount on technology upgrade, among other things.[27]

49.     At the end of each contract term, Intuitive offers an additional service contract. Customers are forced to renew these contracts because, as long as they use the da Vinci, purchasers are required to obtain service and repairs from Intuitive.

50.     The terms of the service contracts exempt Intuitive from its obligation to perform any service or repair if the customer or a third-party services the da Vinci, even if Intuitive's service contract did not cover the service.

51.     Customers have little or no information for projecting the costs of surgical robot parts or service, even with flat-rate service agreements. In order to forecast the cost per use, the customer must know how often the robot will be used. However, customers typically cannot

---

[25] Intuitive (Form 10-Q), at 29 (June 2020).
[26] Intuitive (Form 10-K), at 55 (Feb. 10, 2021).
[27] da Vinci service plan brochures are available at https://www.intuitive.com/en-us/products-and-services/da-vinci/services##.

forecast demand for a surgical robot: surgeons may have varying degrees of adaptation to a surgical robot at a new location or for a new procedure; competing hospitals may or may not acquire their own robots; and the FDA may or may not add new indications for use of the robot system. These and other unknown factors will impact how often a da Vinci is used, and thus bears on part replacement and service costs.

52.    There are high barriers to entry in the da Vinci Service Aftermarket. First, the terms of the da Vinci sales agreement and the tied da Vinci service contracts prohibit customers from servicing their da Vinci either themselves or through an IRRC. Lessees of the da Vinci must enter the same service contract for the term of the lease. This discourages customers from seeking da Vinci repair or maintenance services from IRRCs. The technical skill, experience, and certifications required to properly service the da Vinci also serve as prohibitive barriers to entry into the da Vinci Service Aftermarket.

53.    Quality control is not a valid business justification for excluding third parties from servicing and repairing da Vincis.

54.    Several robot repair companies have the skill and capacity to service da Vincis. For example, Restore, a surgical robotic repair company based in Florida, specializes in the da Vinci and hires da Vinci certified field service engineers with prior training and experience working at Intuitive. Restore began offering service contracts for the da Vinci in 2018 and typically offers service at rates of less than 50% of the effective rates offered by Intuitive. Restore states that it can service da Vincis worldwide. SIS, with 50 years of experience servicing surgical equipment, also claims it is capable of servicing da Vincis. Great Lakes Robotics

("Great Lakes") is another robot repair company that claims to be an "authorized" provider of da Vinci services through its partnership with Restore.[28]

### b.   The Da Vinci Service Geographic Aftermarket

55.     Da Vinci robots are installed throughout the U.S., so IRRCs have the capability to service da Vincis throughout the U.S.

56.     Intuitive sells and services da Vincis through third-party distributors in unspecified countries outside the U.S. and provides them with a toolkit with all the documentation, software, and passwords necessary to service the da Vinci. Distributors may only use their toolkits to service da Vincis in their territory. No one else has access to the toolkit, not even customers.

57.     U.S. hospitals are thus unable to hire service providers from other countries, even if Intuitive raises its da Vinci servicing prices above competitive levels.

### c.   Intuitive Has a Monopoly in the Da Vinci Service Aftermarket

58.     Intuitive exploits its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarket for the service of the da Vinci. Thus, it can and does exclude competition and maintain supracompetitive prices for da Vinci service.

59.     First, Intuitive ties the sale of the da Vinci to da Vinci service contracts. The terms of the sales and service agreements forbid purchasers from using third party repair or maintenance services of any kind. Intuitive even reserves the right to void their entire service contract if customers seek any kind of service, maintenance, or repair for their da Vinci through an IRRC. This effectively forecloses competition in the da Vinci Service Aftermarket.

---

[28] https://www.greatlakesrobotics.net/
559718.1

Complaint and Jury Demand

60.     All these measures discourage customers from attempting to service their da Vinci through an IRRC, further solidifying Intuitive's monopoly in the da Vinci Service Aftermarket.

61.     As a result of this exclusionary conduct, Intuitive has directly maintained a market share in the da Vinci Service Aftermarket of more than 99% for nearly 20 years. In 2019, Intuitive reported $508.4 million in revenues for service to its customers in the U.S.

### 3.     The EndoWrist Service Aftermarket and Intuitive's Abuse of Monopoly Power in that Aftermarket

#### a.  Relevant EndoWrist Service Aftermarket

62.     There is a relevant aftermarket for the service, including repair and replacement, of EndoWrists that is separate from the surgical robot market and the da Vinci Service Aftermarket. EndoWrists are the only surgical instruments that are compatible with and FDA-approved for use with the da Vinci. Because of these constraints, hospitals must have them serviced in order to use the da Vinci.

63.     The EndoWrist Service Aftermarket is vertically integrated, meaning Intuitive exercises complete control over the design, manufacture, sale, and replacement of EndoWrists. Although Intuitive maintains a significant patent portfolio in its surgical robots, any blocking patents for its EndoWrist instruments are long expired. Intuitive maintains a "Patent Notice" web page for its products. Virtually all the patents covering core structure and operations for the "EndoWrist" and "Accessories" are expired.

64.     The EndoWrist Service Aftermarket is significantly larger than either the upstream da Vinci system market or the da Vinci Service Aftermarket. EndoWrists range in price from $700 to $3,500 per procedure. Intuitive's revenues from the sale of instruments and accessories in the U.S. totaled $1.79 billion in 2019, and despite the Coronavirus pandemic, 2020

instrument and accessory revenues were an estimated $1.785 billion.[29] By comparison, Intuitive reported revenues of $830 million from system sales and $508 million from service contracts in 2019.[30]

65.     Indeed, the vast majority of Intuitive's EndoWrist revenue and profit, and thus its overall revenue and profit, comes from the *replacement* of EndoWrists. This is because while a da Vinci represents a large initial investment for Intuitive's customers, they are typically in service for 5 years, if not a decade, while EndoWrists provide a recurring revenue stream. Indeed, the bulk of Intuitive's revenue and profit growth over the last decade in the U.S. comes from its sale of EndoWrist instruments, not robotic systems, as demonstrated by data from Intuitive's 10-Ks from 2001 to 2019 below:[31]

| Year | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| Instruments ($M) | $5.0 | $10.1 | $18.8 | $37.5 | $67.8 | $111.7 | $191.6 | $293.0 | $389.4 |
| Systems ($M) | $44.2 | $56.3 | $61.8 | $78.8 | $124.6 | $205.9 | $324.4 | $455.3 | $490.5 |

| Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Instruments ($M) | $528.8 | $701.1 | $903.3 | $1,033 | $1,070 | $1,198 | $1,396 | $1,637 | $1,962 |
| Systems ($M) | $660.3 | $777.8 | $932.9 | $834.9 | $632.5 | $721.9 | $800 | $928.4 | $1,127 |

[29] Intuitive (Form 10-K), at 98 (Feb. 10, 2021).
[30] Intuitive (Form 10-K), at 87 (Feb. 7, 2020).
[31] These charts reflect Intuitive's worldwide revenues; revenues by region are unavailable prior to 2017.

Complaint and Jury Demand

| Year | 2019 | 2020 |
|------|------|------|
| Instruments ($M) | $2,408 | $2,455 |
| Systems ($M) | $1,346 | $1,178 |

66.     Because of Intuitive's exclusionary service agreements, the EndoWrist Service Aftermarket typically involves replacing EndoWrist instruments rather than servicing them (i.e., cleaning, sharpening, or repairing them). The services provided by Intuitive and those provided (or that could be provided) by IRRCs are substitutable. For instance, hospitals hire Rebotix to inspect and repair EndoWrist instruments, for example, by tightening the graspers or sharpening the scissors. And SIS entered into contracts with several hospitals and health care systems to provide EndoWrist repair services. More hospitals would substitute EndoWrist instrument replacement from Intuitive with these services in the absence of Intuitive's exclusionary contractual terms.

67.     Intuitive's sales agreements require hospitals to replace their EndoWrists exclusively with Intuitive. Per these contracts, Intuitive has the right to void warranties associated with the da Vinci if unauthorized or unapproved instruments are used with the da Vinci. This forces hospitals to continuously purchase replacement EndoWrists from Intuitive or risk voiding their service agreements for the entire system.

68.     Intuitive's standard sales agreement ties the purchase of a da Vinci to its "maximum number of uses" requirement for EndoWrist instruments. The usage requirement

applies to every single EndoWrist instrument, regardless of its condition or whether it could be used on additional procedures.

69.     Before releasing its EndoWrists to market, Intuitive told the FDA that the EndoWrists and traditional instruments "are essentially identical … in terms of shape, size, function, and tissue effect;" "are substantially equivalent in intended use and/or method of operation;" and "demonstrate substantial equivalence … in terms of safety and effectiveness." The FDA agreed and "determined the [EndoWrist] device" is "substantially equivalent" to the traditional devices. Instruments used in traditional laparoscopic surgeries are cleaned and inspected before and after each surgery and may be repaired between procedures, making them usable for hundreds of surgeries.

70.     As shown below in Figure 5, EndoWrist instruments are nearly indistinguishable from manually operated surgical instruments. Both are made from medical grade materials that typically last through hundreds of surgeries.[32] Figure 5 includes an EndoWrist instrument on the left and a traditional, manually manipulated instrument on the right, and illustrates that the instruments are nearly identical.

---

[32] Rebotix Complaint, ¶39.

Figure 5: EndoWrist forceps vs. Traditional manual forceps

 

71.     However, despite being "substantially equivalent" to traditional laparoscopic instruments, Intuitive limits most EndoWrists to ***just 10 uses***, far fewer in orders of magnitude than their manually operated counterparts.

72.     To enforce this arbitrary restriction, Intuitive installs memory chips in its EndoWrist instruments that count the number of uses. Intuitive has exclusive control over the usage counter, and once the counter hits its limit, the chip renders the EndoWrist non-functional by wiping its memory so that the EndoWrist can no longer communicate with the da Vinci. Intuitive has designed the EndoWrists to prevent the maximum usage counter from being tampered with or reset.

73.     According to surgical instrument service companies, with proper care, inspection, and repair, EndoWrists can be used more than fifty times, just like the useful life of traditional, manually manipulated laparoscopic instruments.[33]

74.     The maximum usage requirement for EndoWrists is not based on safety or effectiveness considerations. First, Intuitive has never provided its customers any clinical or scientific data to support its usage limits; Intuitive's own instrument catalogs demonstrate that

---

[33] Restore Second Amended Complaint, ¶80.

the useful lives of the instruments are much longer than their usage limits. Yet irrespective of the actual condition of the EndoWrist once it hits 10 uses, it must be replaced without exception. Second, Intuitive described the EndoWrist to the FDA as possessing substantial equivalence in terms of safety and effectiveness to its manually manipulated counterparts, which have no specific usage limits. Third, when Intuitive sells EndoWrists for training purposes, the usage limits are much higher than the exact same instruments sold for surgical use, with no demonstrable or practical difference between the two. Nor does the surgical equipment industry distinguish between an instrument sold for clinical use and the same instrument sold for training use. Training instruments, like instruments for clinical use, must retain their functionality for the surgeon during use. The only difference is the generation of revenue for the hospital on a surgical procedure for an instrument in clinical use. Intuitive has stated that the maximum usage requirement allows Intuitive to "sell the instrument for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure or per-hour basis," but there are no medical necessity or patient welfare concerns motivating Intuitive's usage caps; rather, this reflects Intuitive's desire and ability to charge supracompetitive prices.[34]

75.     And in July 2020, Intuitive introduced its "Extended Use Program" for EndoWrist instruments used with da Vinci X/Xi systems, where select instruments possess 12 to 18 uses instead of Intuitive's standard 10-use limitation.[35] Intuitive vaguely stated that "continuous improvement in instrument design" enabled it to slightly increase some usage limits, but did not and has not explained why certain instruments were chosen for this program, nor why the usage limits can be upped to 12 or 15 or 18.

---

[34] Intuitive (Form 10-K), at 6 (March 30, 2001).
[35] Intuitive (Form 10-Q), at 29 (July 23, 2020).

559718.1

Complaint and Jury Demand

76.     Usage limits are not based on any FDA regulations. The surgical instruments used with Asensus' Senhance surgical robot system do not have usage limits. Traditional laparoscopic instruments do not have usage limits.

77.     As recently as November 12, 2020, Intuitive submitted a 510(k) premarket notification summary to the FDA for several EndoWrist instruments. The summary does not reference any clinical or scientific data showing that the EndoWrists lose their functionality after reaching the 10-use limit. Nor did Intuitive indicate that EndoWrists could not be serviced to make them safe and effective after reaching the 10-use limit.

78.     Customers cannot predict the costs for EndoWrists. Intuitive has complete control over EndoWrist usage limits and can (and has) changed the usage limits and instructions for use unilaterally and without notice. For example, Intuitive issued instructions for use for EndoWrist instruments, setting a maximum number of autoclave cycles, which sterilize the instruments using steam pressure. Because of the way that da Vinci surgeries are prepped and performed, EndoWrist instruments often have to undergo an autoclave cycle even if not actually attached to a robot during surgery. The specified limit on autoclave cycles is extremely low compared to comparable devices made of similar medical grade materials. These unilateral changes can force early replacement, even if the counter has not hit its maximum use limit. They also substantially increase (a) the per-surgery cost of EndoWrist instruments to hospitals, and (b) Intuitive's supra-competitive EndoWrist profits, without prior notice to hospitals. Intuitive, as the sole manufacturer of EndoWrists, exercises complete control over the prices for replacement EndoWrists. Thus, customers cannot reasonably predict the timing or pricing for replacing EndoWrists.

79.    There exist technological barriers to entry that prevent IRRCs from entering and/or competing effectively in the EndoWrist Service Aftermarket. For instance, for the EndoWrist instruments to work with the da Vinci, they must have a serial number from Intuitive. Thus, IRRCs may only repair the instruments and, to do so, they must be able to reset the instrument's usage counter after the repair.

80.    IRRCs can service EndoWrists to prolong their use, rather than forcing hospitals to purchase replacement instruments based on artificially low usage limitations. For example, Rebotix has developed the Rebotix Interceptor, which resets the counter in at least some EndoWrists. The Interceptor does not interfere with the safety or functionality of the EndoWrist or communication between the EndoWrist and the da Vinci. However, the Interceptor has limited applicability as it works with just one da Vinci model. Restore specializes in the da Vinci and hires da Vinci certified field service engineers with prior training and experience at Intuitive.

81.    And while Restore can reset the usage counter on EndoWrists for the Si robot system, it pays a large licensing fee to develop the technology to do so. Restore passes these costs on to its customers in the form of at least 20% higher service fees. Restore cannot reset the usage counter for other da Vinci systems, including the X and Xi robot systems.

82.    SIS states that it has the personnel, facilities, equipment and experience to service at least 1,500 EndoWrists per month to prolong their use. In fact, SIS states it has already serviced and repaired EndoWrists that have since been used successfully and without incident in da Vinci surgeries. SIS also claims that independent testing shows that instruments serviced by SIS are suitable for at least 50 uses. SIS has developed detailed procedures for restoring EndoWrists to their original specifications and returning them to service. These procedures include disassembly of the EndoWrist, inspection of all components, adjustment of components

as necessary, confirming all movements, and re-setting the EndoWrist counter to Intuitive's original counter value.

83.     Intuitive has maintained a market share in the EndoWrist Service Aftermarket of more than 90% for nearly 20 years.

**b.  The Geographic Market for the EndoWrist Service Aftermarket**

84.     Intuitive is the sole manufacturer of EndoWrists worldwide and is the only seller of EndoWrists in the U.S.

85.     EndoWrists are the only surgical instruments that are compatible with and FDA-approved for use with the da Vinci, making them the only surgical instruments available for use with the da Vinci in the U.S.

86.     U.S. hospitals are thus unable to buy EndoWrists, or potentially substitutable instruments, from suppliers in other countries, even if Intuitive raises its EndoWrist prices above competitive levels.

**c.  Intuitive Has Abused Its Monopoly Power in the EndoWrist Service Aftermarket**

87.     Intuitive leverages its monopoly in the surgical robot market to maintain and abuse its monopoly in the EndoWrist Service Aftermarket. Intuitive's standard sales and lease agreements tie the purchase of a da Vinci to its "maximum number of uses" requirement for EndoWrist instruments. The usage requirement applies to every single EndoWrist instrument, regardless of its condition or whether it could be used on additional procedures.

88.     Intuitive has acted with the clear intent to limit competition in the EndoWrist Service Aftermarket by designing the usage counter to prevent IRRCs from resetting it. It is essential to competition in the EndoWrist Service Aftermarket that IRRCs are able to reset the

usage counter after servicing the instrument. Otherwise, Intuitive's customers are forced to pay exorbitant sums to Intuitive for brand new EndoWrists they do not yet need.

89.    Intuitive actively monitors the EndoWrist Service Aftermarket to ensure its monopoly remains uninterrupted and its customers continue to buy EndoWrists they do not yet need. If a customer or IRRC services an EndoWrist so that it can be used beyond Intuitive's arbitrarily set maximum usage limit, Intuitive sends a letter demanding that they cease and desist from resetting the memory chip to allow the da Vinci to continue communicating with the EndoWrist instrument. Intuitive has also attempted to scare potential competitors out of the EndoWrist Service Aftermarket. On or about February 12, 2019, Intuitive sent a cease-and-desist letter to Restore, demanding that it "immediately cease and desist" from "contacting Intuitive's customers to offer service related to Intuitive's products" and resetting the usage counters. Intuitive has also sent letters to Rebotix's customers, threatening to withhold necessary contractual maintenance if the hospital uses Rebotix's EndoWrist repair services. This would render the da Vinci useless. Further, after learning that its customers had entered into service contracts with SIS, Intuitive sent letters threatening to render the surgical robot inoperable and falsely claiming that using repaired EndoWrists would violate FDA requirements and intellectual property rights. SIS alleges that as a result of Intuitive's threats, all of its customers backed out of their service agreements with SIS.

90.    Intuitive's anticompetitive conduct enables it to charge its customers supracompetitive prices that are independent of and far exceed the cost of EndoWrist instruments. An internal review by the healthcare system Kaleida Health revealed an average instrument cost of $3,400 per da Vinci procedure.[36] Restore Robotics claims that Intuitive

---

[36] Perez, R. E. & Schwaitzberg, S. D., Robotic Surgery: Finding Value in 2019 and Beyond, Ann. Laparosc. Endosc. Surg. 2019; 4:51.

charges approximately 30% higher prices on average for EndoWrist instrument replacement compared with EndoWrist instrument repairs by IRRCs.

91.     To protect its EndoWrist monopoly pricing, Intuitive has announced that as of 2023, it intends to stop selling S and Si EndoWrist instruments, for which IRRCs can reset the usage counter. This will force its customers to upgrade their da Vincis to those using EndoWrists for which IRRCs cannot reset the usage counter.

92.     As a result of their exclusionary schemes, Intuitive can and does charge supracompetitive prices to replace EndoWrists at significantly higher costs than offered by IRRCs to service EndoWrists for prolonged use.

93.     As a result of this exclusionary conduct, Intuitive has maintained a market share in the EndoWrist Service Aftermarket of more than 90% for nearly 20 years.

**B. Intuitive's Anticompetitive Conduct Injured Plaintiff and the Proposed Class**

94.     The services provided by Intuitive and those provided (or that could be provided) by IRRCs are substitutable, such that being able to use IRRCs could save hospitals a significant amount of money. However, due to the exclusionary service agreements Intuitive ties to the sale or lease of the da Vinci, these substitute services are typically not a viable option for hospitals. Hospitals, therefore, have little choice but to pay higher prices to obtain da Vinci service and (more frequent) EndoWrist instrument replacement from Intuitive.

95.     EndoWrists are the only instruments that are FDA-approved to work with the da Vinci. Within its sales contracts for the da Vinci, Intuitive ties the sale of the system to renewable service contracts for EndoWrists. Thus, customers have no choice but to accept Intuitive's restrictive terms and supracompetitive pricing scheme for the service of the da Vinci and EndoWrists.

96. Intuitive's tying scheme ensures high recurring revenues because it forces Intuitive's customers to constantly purchase EndoWrist instruments after as few as ten uses at a significant and unnecessary cost, instead of having them serviced for prolonged use.

97. Even where an IRRC may disrupt or neutralize the EndoWrist counter, the instrument must be repaired before exercising the last available use, lest the system automatically disable the EndoWrist. This, in turn, robs the customer of one use every time the EndoWrist is serviced.

98. Restore claims to (a) offer service of the da Vinci at effective rates of less than 50% of the effective rates offered by Intuitive, and (b) repair EndoWrist instruments at least 25% on average below replacement rates offered by Intuitive. SIS claims that a hospital would save 55-70% by having their EndoWrists serviced by SIS rather than purchasing replacement EndoWrists. Similarly, Rebotix claims to provide significant savings to hospitals on EndoWrist instrument expenses, while providing as much safety and efficacy as Intuitive. And according to Great Lakes, repairing EndoWrist instruments could save hospitals more than $100,000 per robot, per year.[37] With a current installed base of approximately 3,720 da Vinci systems in the U.S., this suggests a total savings of $372 million per year if EndoWrists were repaired by IRRCs instead of being replaced by Intuitive. In the but-for world, absent Intuitive's unlawful restraints of trade, Intuitive would need to compete on price to protect an erosion of its market share in response to IRRC's lower prices, whether by reducing Intuitive's own prices for service, increasing the number of times an EndoWrist can be used, or both. The downward pressure on price that would result from unfettered competition between Intuitive and its IRRC rivals would

---

[37] https://www.greatlakesrobotics.net/sales

559718.1

Complaint and Jury Demand

inure to the benefit of all direct purchasers in the market, whether they would have purchased from Intuitive or an IRRC rival.

99.     It is no secret that hospitals pay above and beyond what is necessary to maintain a da Vinci. For instance, according to a systematic cost assessment made on robotics in general surgery: "Nowadays, the only commercially available robotic equipment (da Vinci®, Intuitive Surgical Inc.; CA, USA) is characterized by elevated cost, including the cost of acquisition, training, and equipment-instrument cost, as well as that of maintenance of the robotic system (with an annual service contract, over 100,000 US dollars)."[38]

100.     By tying the service of the da Vinci, and the repair and replacement of its EndoWrists, to the sale of the da Vinci, Intuitive captures nearly 100% of the U.S. market for the da Vinci Service and EndoWrist Service Aftermarkets. And in its annual reports, Intuitive repeatedly notes how IRRCs may emerge and compete with Intuitive on price or offerings, and Intuitive's failure to compete successfully with these IRRCs may cause its revenues to suffer. This acknowledgement from Intuitive demonstrates that absent Intuitive's anticompetitive conduct, not only would the hospitals that purchased or leased da Vincis from Intuitive have cheaper alternatives from IRRCs in terms of servicing the da Vinci and/or EndoWrist instruments, but that Intuitive would also charge lower prices in order to better compete with these IRRCs.

101.     The exclusionary scheme has the effect of driving the majority of Intuitive's annual revenues. First, demand for da Vinci service and EndoWrist service is largely derived from demand for da Vinci systems. So, by purchasing a da Vinci to attract more patients and

---

[38] Gkegkes, I. D., Mamais, I. A., & Iavazzo, C. (2017). Robotics in General Surgery: A Systematic Cost Assessment. Journal of Minimal Access Surgery, 13(4), 243–255. Https://Doi.Org/10.4103/0972-9941.195565

skilled surgeons to their facilities, hospitals are automatically locked into the Intuitive-controlled aftermarkets for da Vinci service and EndoWrist replacement/service.

102.    In fact, in their 2019 10-K, Intuitive reported product revenue of $2.621 billion in the U.S., of which 57% was attributable to instruments and accessories, and 16% was attributable to service contracts.[39] In the U.S., Intuitive reported (a) $508 million in revenue from service contracts, and (b) $1.79 billion in revenue from instruments and accessories.[40] Furthermore, globally, in 2019, Intuitive's gross profit was 70.2% for products and 65.6% for service.[41] Intuitive's net income for 2019 in the U.S. was 31% of total revenue.[42] This greatly exceeds the average profit margin of 8.5% in the medical equipment repair & maintenance industry.[43] This level of supracompetitive profit margin is commonly observed in industries characterized by substantial barriers to entry and a single participant possessing a dominant market share, as is the case for Intuitive in the da Vinci Service and EndoWrist Service Aftermarkets.

103.    There is no legitimate business, safety, or efficiency justification for Intuitive's anticompetitive scheme, which was employed for the sole purpose of eliminating competition in the da Vinci Service and EndoWrist Service Aftermarkets, thereby causing Plaintiff and the proposed Class to pay significantly more than they would have in a competitive market for these services.

## CLASS ALLEGATIONS

104.    Plaintiff brings this action on behalf of itself and on behalf of a class (the "Class") consisting of all entities that paid Intuitive directly for da Vinci service and/or the service,

---

[39] Intuitive (Form 10-K), at 56 (Feb. 7, 2020).
[40] *Id.* at 87.
[41] *Id.* at 57.
[42] *Id.* at 45.
[43] Jack Curran, "Medical Equipment Repair & Maintenance Services," IBIS World, June 2020, at 7.

including repair and replacement, of EndoWrists in the United States at any time from May 21, 2017 to the present (the "Class Period"). Excluded from the Class are Defendant, its officers, subsidiaries and affiliates, and all government entities.

105.    Plaintiff seeks class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

106.    **Numerosity.** Hundreds of hospitals, trauma centers and/or clinics have purchased da Vinci service and EndoWrist instruments during the Class Period pursuant to Intuitive contracts that tied sales of da Vincis to aftermarket sales of service. Thus, there are numerous Class members and joinder is impracticable. The Class members are identifiable from information and records that are required by law to be maintained by Defendant.

107.    **Typicality.** Plaintiff's claims are typical of the claims of the other members of the proposed Class. Plaintiff and members of the proposed Class purchased da Vinci service and/or EndoWrist surgical instrument service directly from Defendant during the Class Period at supracompetitive prices resulting from Defendant's unlawful actions. Plaintiff and members of the proposed Class have sustained damages in that they paid inflated prices for the service and repair of da Vinci systems and repair/replacement of EndoWrist instruments during the Class Period due to Defendant's conduct in violation of federal law.

108.    **Adequacy of Representation.** Plaintiff will fairly and adequately protect and represent the interests of the proposed Class. The interests of the Plaintiff are not antagonistic to those of the proposed Class. In addition, Plaintiff is represented by counsel, who are experienced and competent in the prosecution of complex class action, antitrust and consumer protection litigation.

109. **Ascertainability.** Plaintiff has defined the Class so that Class members can be identified using objective criteria, i.e., entities that purchased da Vinci service and EndoWrist instruments directly from Intuitive during the Class Period. Defendant's data can identify all Class members.

110. **Commonality and Predominance**. Questions of law and fact common to the members of the class predominate over questions, if any, that may affect only individual members.

111. Questions of law and fact common to the Class include without limitation:

   i.     Whether Defendant's conduct constitutes an illegal tying scheme under Section 1 of the Sherman Act;

   ii.    Whether Defendant's conduct constitutes illegal monopolization under Section 2 of the Sherman Act;

   iii.   Whether Defendant abused its monopoly power in the U.S. surgical robot market in order to gain a competitive advantage in the markets to service and repair da Vinci systems and EndoWrist instruments in violation of Sections 1 and 2 of the Sherman Act;

   iv.    Whether Defendant's conduct had the effect of substantially lessening competition in the (1) da Vinci Service; and (2) EndoWrist Service Aftermarkets;

   v.     Whether Defendant's unlawful conduct caused Plaintiff and the proposed Class to pay more for da Vinci service, and to service, repair and/or replace EndoWrists than they otherwise would have paid; and

   vi.    The appropriate measure of damages incurred by Plaintiff and the proposed Class.

112. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other

hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

113.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through a representative would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendant. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I – MONOPOLIZATION OF THE
### DA VINCI SERVICE AFTERMARKET

114.    Plaintiff and the proposed Class repeat and allege the foregoing allegations with the same force and effect as if here set forth in full.

115.    Intuitive has willfully acquired and maintained monopoly power in the da Vinci Service Aftermarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116.    As a direct and proximate result of the foregoing conduct, Plaintiff and the Class have been injured in their business and property in an amount not presently known.

### COUNT II – ATTEMPTED MONOPOLIZATION
### OF THE DA VINCI SERVICE AFTERMARKET

117.    Plaintiff and the proposed class repeat and allege the foregoing allegations with the same force and effect as if here set forth in full.

118.    Intuitive has attempted to monopolize the da Vinci Service Aftermarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to

monopolize the da Vinci Service Aftermarket by engaging in exclusionary conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

119.    As a direct and proximate result of the foregoing conduct, Plaintiff and the Class have been injured in their business and property in an amount not presently known.

## COUNT III – TYING OF THE DA VINCI
## SERVICE AFTERMARKET

120.    Plaintiff and the proposed Class repeat and allege the foregoing allegations with the same force and effect as if here set forth in full.

121.    Intuitive has engaged in an unlawful tying arrangement in unreasonable restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This illegal scheme tied da Vinci service to the sale of the da Vinci system.

122.    Surgical robots and da Vinci service are separate products that are sold or leased in separate markets from one another.

123.    At all times relevant to this action, Intuitive has maintained substantial economic power in the surgical robot market. Intuitive's tying arrangement has had anticompetitive effects in the domestic da Vinci Service Aftermarket.

124.    Intuitive's tying scheme had no legitimate safety, efficiency, or business purpose. It achieved no legitimate efficiency benefits and had the anticompetitive effect of foreclosing competition in the market to service the da Vinci, such that Plaintiff and the proposed Class could only obtain these services from Intuitive.

125.    A substantial amount of interstate commerce was affected by Intuitive's tying scheme. Intuitive reported $508.4 million revenues from service contracts and $1.790 billion revenues from parts and accessories in 2019 alone.

126.    As a result of Intuitive's violations of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property in an amount not presently known.

## COUNT IV – MONOPOLIZATION
## OF THE ENDOWRIST SERVICE AFTERMARKET

127.    Plaintiff and the proposed class repeat and allege the foregoing allegations with the same force and effect as if here set forth in full.

128.    Intuitive has willfully acquired and maintained monopoly power in the EndoWrist Service Aftermarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

129.    As a direct and proximate result of the foregoing conduct, Plaintiff and the Class have been injured in their business and property in an amount not presently known.

## COUNT V – ATTEMPTED MONOPOLIZATION
## OF THE ENDOWRIST SERVICE AFTERMARKET

130.    Plaintiff and the proposed Class repeat and allege the foregoing allegations with the same force and effect as if here set forth in full.

131.    Intuitive has attempted to monopolize the EndoWrist Service Aftermarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to monopolize the EndoWrist Service Aftermarket by engaging in exclusionary conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

132.    As a direct and proximate result of the foregoing conduct, Plaintiff and the Class have been injured in their business and property in an amount not presently known.

1

2

**COUNT VI – TYING**
**OF THE ENDOWRIST SERVICE AFTERMARKET**

3        133.    Plaintiff and the proposed class repeat and allege the foregoing allegations with

4  the same force and effect as if here set forth in full.

5        134.    Intuitive has near-absolute monopoly power in the domestic market for minimally

6  invasive surgical robots. Intuitive has conditioned the sale and servicing of the da Vinci on

7  customers buying replacement EndoWrists from Intuitive instead of repairing the EndoWrists

8  that the customers already have, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9        135.    Surgical robots and the service, repair, and replacement of EndoWrists are

10  separate products that are sold or leased in separate markets from one another.

11        136.    Intuitive's tying scheme had no legitimate safety, efficiency, or business purpose.

12  It achieved no legitimate efficiency benefits and had the anticompetitive effect of foreclosing

13  competition in the market to service, repair and replace EndoWrists such that Plaintiff and the

14  proposed Class could only obtain these services from Intuitive.

15        137.    A substantial amount of interstate commerce was affected by Intuitive's tying

16  scheme. Just in 2019, Intuitive's total revenues from parts (primarily EndoWrists) exceeded

17  $1.790 billion, and Intuitive reported $508 million revenues from service contracts. These

18  amounts account for 73% of Intuitive's revenues in 2019.

19        138.    As a result of Intuitive's violations of Section 1 of the Sherman Act, Plaintiff and

20  the Class were injured in their business and property in an amount not presently known.

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the proposed Class respectfully request the following relief:

A.    Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure,

certify Plaintiff as a Class representative and designate its counsel as counsel for the Class;

B.      Declare that Defendant's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act;

C.      Award Plaintiff and the members of the proposed Class damages determined to have been sustained by each of them, trebled as provided by law;

D.      Award Plaintiff and the proposed Class their costs of the suit, including attorneys' fees, as provided by law; and

E.      Grant such other relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff and the Class hereby demand trial by jury of all issues properly triable thereby.

Dated:  July 8, 2021                          Respectfully Submitted,

By: /s/ *Bonny E. Sweeney*

Bonny E. Sweeney (SBN 176174)
Seth R. Gassman (SBN 311702)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: 415-633-1908
Fax: 415-358-4980
bsweeney@hausfeld.com
sgassman@hausfeld.com

Jeffrey J. Corrigan (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email:  jcorrigan@srkattorneys.com
          jspector@srkattorneys.com
          ietheridge@srkattorneys.com

Michael J. Boni (*pro hac vice application forthcoming*)
Joshua D. Snyder (*pro hac vice application forthcoming*)
John E. Sindoni (*pro hac vice application forthcoming*)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
Email:  mboni@bonizack.com
          jsnyder@bonizack.com
          jsindoni@bonizack.com

W. Joseph Bruckner (*pro hac vice pending*)
Brian D. Clark (*pro hac vice pending*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Fax: 612-339-0981
Email:  wjbruckner@locklaw.com
          bdclark@locklaw.com

Howard Langer (*pro hac vice pending*)
Edward Diver (*pro hac vice pending*)
Peter Leckman (CA Bar No. 235721)
LANGER, GROGAN & Diver, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel.: 215-320-0876
Fax: 215-320-5703
hlanger@langergrogan.com
ndiver@langergrogan.com
pleckman@langergrogan.com


Eric L. Cramer(*pro hac vice pending*)
BERGER MONTAGUE
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-3009
ecramer@bm.net


William J. Leonard (*pro hac vice pending*)
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
Centre Square West, Suite 3400
1500 Market Street
Philadelphia, PA 19102-2101
Tel.: 215-665-3000
Fax: 215-665-3165
William.leonard@obermayer.com

*Counsel for Plaintiff Kaleida Health and the Proposed Class*